25-15-63 SBK ART LLC versus Aiken-Gump, Strauss-Houghton-Feld. All right. Attorney, is it Tice? Tice. Yep, that's correct. Good morning, Your Honor. As it may please the Court, under Kiobel, quote, a district court should not exercise its discretion to grant a Section 1782 petition for documents held by a U.S. law firm in its role as counsel for a foreign client if the documents are undiscoverable from the client abroad because this would disturb attorney-client communications and relations, close quote. In granting a stay pending appeal, the district court acknowledged expressly that that rule, whether it applies here, presents a serious legal question. It squarely applies here, Your Honor. SBK seeks from the Aiken law firm documents that belong to Aiken's foreign client, Fortinova, even though those documents are undiscoverable from Fortinova abroad. But in Kiobel or Kiobel, I'm not sure, that case, it's a factually different situation, right? Those are documents, my understanding is those are documents that the client gives the law firm because they need to be produced or reviewed. And here it's a different situation, right? The universe that the district court ended on for potential disclosure here is, we'll first narrow it to non-privileged documents, but it's these documents that Aiken, some in other proceedings. So there is this factual difference. How is that, does that matter here? And if so, if not, why not, I guess I'll say. Well, I agree with you there is a factual difference, Your Honor. We think it strongly cuts in our favor. In that case, the custodians of the documents were U.S. custodians. They were documents that have been sent to U.S. counsel and were held by U.S. counsel in connection with U.S. litigation. Here, these are documents actually created by London attorneys, and all the custodians for the documents are actually in the U.K., not in the U.S. So unlike in Kiobel, where there was actually U.S. custodians that they were going after, this is a situation where all the primary custodians in the way that Banoka, the recent Second Circuit decision, uses that term, are located abroad. So we think it cuts strongly, actually, in our favor, that factual distinction, because it really goes to the heart of what Kiobel's concerns were. Kiobel was concerned that if you were to allow discovery from a law firm of documents that it held in its role as legal counsel for a foreign client, when those documents are undiscoverable, it's going to cause all these problems. It's going to require clients to withhold documents, leading to bad advice. It's going to— But how—so help me understand, then, why the location of the custodian changes the analysis you're launching into. Well, because this is a situation where there's even less of a connection to the U.S., but I think more directly to your question, this is a situation where the documents themselves are intricately bound up in the legal work that the law firm is doing. It goes even more to the question of, is this infringing on communications with an attorney? Well, but the order specifically says not privileged documents, right? So that's—  In these two cases, we have the statutory question, which nobody is contesting here. Then we have the intel factors, and then we have the discovery order itself, which is then sort of under Rule 26, right, where they're applying the ordinary discovery rules, and the district court said no privileged docs here. You're right, Your Honor, but the documents were discovered—excuse me, weren't privileged in Kiobel either. That's another similarity between the two cases. No, but here, it seems to me that Kiobel is very much different. First of all, there's no protective order, correct? That is true, Your Honor. It's a distinction, and it seems to me, as the judge said, we're not dealing with attorney-client privileged documents. Those are already out of the case. But that was true in Kiobel. They were relevant in Kiobel. Excuse me. I'm sorry to interrupt you. That was true in Kiobel as well. Those documents were not attorney-client privileged either, and the Court said, nevertheless, under—starting with the line of cases beginning with Fisher, as interpreted through Sario, and, you know, extended to the 1782 context, the principle actually applies beyond strictly attorney-client privileged communications, because, again, what we're concerned about is the attorney-client relationship. We're concerned that clients are not going to be willing to engage U.S. law firms at all, that if they do, they're going to be worried about what documents they can turn over to them, what they can ask them to do, for fear that in a purely European dispute, which is exactly what happened here, the client is going to be embroiled in a U.S. discovery dispute over the documents, by nature, frankly, solely of the document retention and server access policies that AikenGov has. I think Kiobel said that would be a bad consequence of that case. It would lead to inefficient and expensive, you know, document retention policies. But I do think that if this Court were to affirm the judgment below, that that is the message you'd be sending to law firms, stop allowing your documents to be accessed in New York if they're purely foreign representations, or else your clients will be hailed into court here. How is that, given the fact that we're not supposed to apply the intel factors mechanistically or strictly, and in this case, the district court opinion was very specific in the rather limited amount of material that could be turned over? You have to add in the fact that Aiken was actively, was acting as a lobbyist. So those are not privileged in any way. And I'm not sure that allowing those to be produced is going to inhibit attorney-client communications. Well, a few points. Because it's a totally separate function. There's no protection for those. A few points, Your Honor. First of all, you're absolutely right. Both the magistrate judge and the district court walked through the factors carefully. I think they did their very best to heed this Court's instructions and the Supreme Court's  But Kiobel says what it says. Kiobel says the district court should not exercise its discretion in a circumstance like this, including in a case like Kiobel itself, which did not involve attorney-client communications. So I do think that that is at least a default rule that the district court ought to have contended with and said this is that rare case that notwithstanding the clear instruction we're getting from Kiobel, we should, you know, this is that rare case that is an exception from it. But on the lobbying point, Your Honor, I think we strongly disagree that lobbying went on. I think what happened before the district court and the magistrate judge is that they treated this sort of like a complaint where they took the allegations as true that there was lobbying going on and therefore allowed essentially our SBK to rummage through these European Wasn't Aiken a registered lobbyist for Fortunova? In the U.S. In the U.S. For about 27 hours out of a 27,000 total scope of representation. That's in the Bob Pease, the general counsel of Aiken Gump's declaration. It is at J.A. 1508, I believe. So 99.9 percent was non-lobbying related. His declaration also says that there was, that none of the timekeepers who actually performed work that related to the matters at issue in the subpoena were even registered to lobby in the U.K. or in Europe. So it would have been unlawful for them to be engaging in lobbying activities there. Well, it strikes me that one of the landmines that the decision as it currently stands leaves unanswered that you all are going to be contending with comes from this discussion about lobbying that isn't actually embedded in any sort of final order from the court. But it suggests a very broad conception of lobbying that's unmoored to the actual, at least U.S. law, about what it means to lobby. And I'm wondering about that. That was relevant both to the sort of decision not to go down the guillotine road, but also everybody saying, oh, yeah, privileged stuff isn't discoverable. And I'm just curious. You, in your own brief, raise the prospect that the London affiliate's work product associated with advising about the corporate structure and other things would be discoverable under the court's order, even though that seems very clearly to be privileged. Is that worry coming from this unbounded reference to lobbying? Absolutely. Let me be totally clear about that. We take the position, and this is also clear from the record, that same Bob Pease declaration says, I believe, based on my experience as general counsel of this firm and my review of a limited number of these documents, that essentially all of these are going to be privileged, very likely to be privileged. The problem is twofold. One, SBK takes a very different view and has opened up this sort of lobbying door, which seems to me very vague and not really more than anything, because I think to your point, Your Honor, there's no such thing as a special lobbying exception. It's any communication with a lawyer may or may not be privileged, depending on whether it falls within the ordinary rules of term-declined privilege. There's not a special carve-out just for lobbyists. If a lobbyist is performing activities that don't fall within the perception, the privilege. But isn't that the next fight? Right? So what's before us is the order that says nothing privileged. And then we all, you know, you'll produce a 9,000-page privilege law, right? And there will be a fight about what is and isn't privileged. But that's the next fight. Well, Your Honor, I don't think so, because that's not what Kiobel said. And the reason is, again, I think it goes to this problem. If I could just finish the answer I was just saying, and then I'll address yours if you don't mind. I think one of the other problems, too, is we take the position that none of this is privileged. But as the magistrate judge recognized, the privilege question is actually a question under foreign law. It's a question of what the privilege would be under U.K. law or potentially Maltese law or Dutch law, none of which has been briefed. We don't know. Again, SBK is going to take a different position from us on that question. What difference does that matter? It seems to me that Judge Marion's question is still live. That's not before us now. There are means to determine what documents are privileged under whatever the appropriate law is. That's not what's before us. Yeah. I understand, Your Honor. I was just saying the risk that even though we think very few documents will be turned over that are privileged, we do think there is a significant risk here of harming the attorney-client relationship because a client ex ante is not going to have any idea when it communicates with its client whether, if this judgment is affirmed, whether these documents are going to have to be turned over pursuant to a U.S. discovery process in a case that doesn't actually involve anything having to do with the U.S. But when the — whoever is going to decide what's privileged and what isn't, by definition, there will be no privileged documents turned over. So that concern, it seems to me, is a devalued one. Well, I think, Your Honor, in response to both that question and to Judge Merriam's, there's never going to be a situation under Section 1782 where you turn over privileged documents. The statute itself says documents that are privileged should not be turned over. Their original subpoena said we're not seeking privileged documents. So that's never been the question. And yet in Kiobel, even though that was the baseline rule, Kiobel said in a situation where the documents are undiscoverable from the client abroad, they should not be obtained from the attorney in the U.S. But isn't that the starting point of the analysis and not the end point? I don't think so, Your Honor, because I think the concern there, and indeed in Kiobel, the petition was denied completely, not just for nonprivileged documents. It was just denied saying, no, if you want the documents, go after the target of documents. Don't go after their law firm. And I think the reason is because whether or not we're actually ultimately, you know, if we turn over that 0.1 percent of documents that are unprivileged after they've rummaged through all these client files trying to find something that's not privileged, that still harms the attorney-client process. Our client, Fort Nova, when it hired us in London, my London colleagues in London, to perform a matter restructuring sanctions advice and other legal matters for a Croatian client, never thought in a million years that it would be dragged into a protracted discovery dispute in New York. It just had nothing to do with it. And I think Kiobel suggests the reason why. It's because, you know, allowing 1782 to be used this way really would interfere with attorney-client communications and chill them. Can you answer a couple of housekeeping questions? Of course. So my understanding is that the EU proceedings have resolved. The – I have notes on this, Your Honor. I think there is a number of proceedings. I think there's about a dozen total that SPK has filed. But in terms of the proceedings that are the foundation for the – for use in statutory requirement in this case, there were three. Correct. There was the EU, there was Malta, and then there was a potential future case probably in the Netherlands. And the district court relied on two of those, didn't get into the potential one. And so I'm just wanting to – we do have case law that if the proceeding no longer exists, then the case is sort of moot. And I just – I'm trying to satisfy myself that there is, in fact, still a foreign proceeding that was a foundation for this. And I'll ask your friends across the – I just thought maybe you would know. Yeah. Let me talk to my clients like that – or excuse me, my colleagues during my break, and I will answer your question when I stand back up. I'm not exactly sure of the current status of each of those proceedings. Okay. Thank you. We'll hear from you again. Thank you. And we'll turn to your colleague, Attorney Landy. Good morning, Judge Robinson, Judge Merriam, Judge Stein. May it please the Court. My name is Robert Landy. I'm counsel for the petitioner of HELE, S-B-K-R-L-L-C. To answer Judge Robinson's – your question, there is still proceedings before the Court of Justice of the European Union as well as Malta. I recognize that the district court did not rely on the potential proceedings in the Netherlands, but there are now several active proceedings in the Netherlands. So there are still proceedings ongoing. I think the way to start here is to address Kiobel. And, you know, my adversary has read a quote from Kiobel several times. And that quote comes from Kiobel's discussion of the application of Sario. There are several cases that are very important here. It's Sario followed by Ratliff followed by Kiobel. However, it's not the only time the Kiobel court discusses the issue of the impact of allowing discovery from law firms. And it's happened. The ruling of the court comes in the introduction of the case, and I'll read it because you'll note it continues further beyond what the appellant suggests. The unedited holding, which is in the third paragraph of the case, states, quote, We conclude that while the district court had jurisdiction over Kiobel's petition, it was an abuse of discretion to grant it. As we cautioned in application of Sario, cited, an order compelling American counsel to deliver documents that would not be discoverable abroad and that are in counsel's hands solely because they were sent to the United States for the purposes of American litigation, comma, would jeopardize the policy of promoting open communications between lawyers and their clients. Later on, when discussing Kiobel or when Kiobel discusses the Sario with Ratliff and notes that Ratliff, where in Ratliff this Court permitted discovery, in fact reversed the district court's denial of discovery from Davis-Polk, it noted that in Ratliff the documents at issue had previously been disclosed to third parties. So that takes us back to what did the district court in this case actually do, which is something that is not harped on by the appellants. It was a limited disclosure. Well, but it clearly departed, and you can sort of dismiss it as a description of the Kiobel court's understanding of the holding of Sario. But the notion that it's problematic, that this isn't just a typical 1782 case. When you start going after a law firm to get documents rather than getting them through whatever foreign proceeding from the actual party to that proceeding, you're mucking around in the attorney-client relationship in a way that's concerning. That's one part. And the second part is a real concern about the impact on especially sort of big transnational U.S. law firms if their work product and not even just their work product but documents that are sent to them or that come up in the course of their representation are now fair game for 1782. That's going to harm the guild, so to speak. And I'm wondering why that concern doesn't apply with even more force, as your friends argued, when it isn't even somebody who's come to a U.S. law firm. It's somebody who's gone to a London affiliate of a U.S. law firm that shares a server. I mean, that feels as though the impact on the legal standing of U.S. law firms that have international ties is going to be impacted by that. Can you just assuage my concern? Certainly, Judge Robinson. The order that was issued by or the recommendation report from Judge Tarnowski followed by the order adopting it and effectively restating it from Judge Engelmeyer recognizes all of those concerns, which is why it tailors very narrowly the disclosure it permits. And it tailored the time frame. It tailored the topics. Most importantly, it limited disclosures not only to nonprivileged documents, but to documents that had been already disclosed to third parties other than its clients. So here, it's not a universe of documents that, like in Kyobel and like in Sario, the client had given to its attorney for consideration. It was documents that were created by the law firm and sent out into the public as part of the deal progress. But it didn't totally limit it to that because it also said documents that are solely possessed by the law firm. I guess that would be its work product. All documents concerning research and drafting and or preparation of the Aiken opinion.  So I guess one of the questions is, if all documents concerning, and that sounds pretty broad, and I guess maybe the question is, is it a fight for another day as to whether attorney work product, for example, is within the scope of that? This is where I'm concerned about the whole discussion about lobbying.  I believe there is definitely going to be, as Judge Mariam said, a approximately 9,000-page-long privilege log, and there will be a fight for another day. However, with respect to the Aiken opinion itself, recall that that is the document that was affirmatively disclosed by Fortinova, not only in legal proceedings, but to the European Council itself. And the subject matter of the Aiken opinion is not Aiken's client. It's at SPK's college. Yeah, and I think under Riddlaff, that's just like the disclosure of the SAC is fair game. It may even be the documents referenced as supporting that or reviewed in that. I'm getting at the e-mails between members in the firm. I'm trying to figure out whether you're really trying to get at that. I think that's not what we're trying to get at. Okay. My understanding of the way I interpret— So you're not going to fight about that? No. What I'm interpreting, the second clause of the limitations, because I think that the first clause of documents that were— that disclosed to third parties other than the client are squarely under the Ratliff decision and should not concern this Court. The nonprivileged documents uniquely in Aiken's possession, which would mean that they were not possessed by the client as well, likely relates to, now we get into, was there lobbying activity? Was there pure business advice, as Judge Tarnofsky said, that there might be pure nonprivileged business advice? If there are documents that are, you know, that Aiken has in its possession that either relate to a very important aspect where a privilege was waived or relate to nonlegal work that they did, they may also be discoverable. But that is certainly a fight that we expect to have in the coming months. Okay. And is that a fight that happens pursuant to U.S. law or pursuant to the U.K. law? Or what law? I'm just curious. Likely many of them. Okay. I'd like to briefly touch on the second claim for relief, wherein Aiken is asking that the Court vacate remanded decision for a consideration of the foreign discoverability of these documents. First of all, the District Court has considered the issue of foreign discoverability. In fact, they considered it twice, because Judge Tarnofsky considered it. In its objection, Aiken noted, Aiken suggested that this issue had not been considered and was then. Well, didn't Judge Tarnofsky consider it by basically saying it's not relevant? Yes. Okay. And we have law that says, yeah, it's relevant. It's not dispositive, but even in the non-attorney context, and of course that's where it sort of gets a little weird, right? We have a sort of specialized line of cases dealing with when you're trying to use 1782 against a law firm versus using it generally. But even in the using it generally, you can and should consider it, but you can't make it dispositive. You can consider it. And the Bonocca case, which Aiken brought up in its briefing, is kind of the contrapositive of their argument. In Bonocca, this Court found that a district court does not abuse its discretion when it does consider, but not that it must consider. And if we back this all up, all of these — this issue comes from the Intel case from the Supreme Court, where in Judge Ginsburg's majority opinion, the rule was made clear that foreign discoverability is not a requirement under Section 1782. No, but if you're trying to figure out whether this use of 1782 is an attempt to circumvent the limitations of foreign discovery, wouldn't it make sense? And you're going after the American affiliate of a law firm in London that did work for the client who's the one who's actually in the proceeding. Wouldn't it be a pretty important factor to understand what the opportunities were to get it through whatever proceedings you might have in England for pre-suit discovery from lawyers or from the client in the process? Yes, Judge. That is the third factor of the four Intel discretionary factor analysis. And that — it wasn't simply thrown — you know, tossed aside as irrelevant. It was considered significantly by the district court. Now, in the district court proceedings, Aiken relied heavily on an argument that was rejected, suggesting that EU sanctions law prohibited discovery.  No, I — Which it found nonres — And I think the Court spent a lot of time on that, which is a slightly different argument from this one that it didn't actually engage with, because — maybe because it was so focused on the — Well, I would respectfully disagree. It did engage with it. But to some extent, it was engaging with the arguments presented to it at the time.  The — you know, Aiken's arguments were not, we need to just consider — you know, reconsider Intel in this particular circumstance because we are a law firm. Aiken argued heavily that sanctions controlled here. And so because that was the argument, that is what the district court responded to. Is it — I mean, and I don't think the parties might have been alerted to sort of this nuance until the more recent decision in Monaco, but it seems to me the shared server issue — again, if you're trying to evaluate whether this is an attempt to circumvent foreign limitations, the fact that rather than going to the London law firm that actually did the legal work, you go to its U.S. affiliate who, because it has a shared server, wouldn't that be an important consideration in trying to figure out if this is an attempt to circumvent? Again, I believe that is the third factor. But keep in mind, Aiken Gump LLP is a New York limited liability practice. Their London office is part of the New York limited liability practice. There's only two Aikens, one that's based in Washington, which is effectively its U.S. firm, and one that is based in New York. The one based in New York is all of the various things. So New York is where this firm is headquartered. And 1782 law is clear that you can go to the headquarters. So it's not like we're going to the New York office of a magic circle firm and saying, give us the documents from London. We went to the headquarters. They are here. Okay. That's helpful. If there are no other questions, I thank the Court for its time and for accepting this case on an expedited basis. Appreciate it. Thank you. Attorney Tice, can you start by sort of responding to that last exchange I just had with your friend? Sure. Regarding Aiken Gump. The structure of Aiken. Is this, in fact, I think I might have picked up more. I discern from your arguments that the shared server issue was significant, in part because of the structures of the firm. Am I misunderstanding the structure of the firm? Well, I think it's the structure of international law firms, Your Honor. I think some have multiple offices in different countries. Some might have a single corporate location, and then partners are employed around the world. I don't really think that makes a big difference in this case. I think in Minoka the question was where are the primary custodians. I know, but if Aiken in London is Aiken in New York City, then it gets harder, right? In other words, you're not making an argument that there's a separate legal status or entity in London that's bound with New York. You're not denying what I think I just heard, that the New York office is part and parcel of the New York-based firm. Well, again, I think it's the nature of global law firms, Your Honor. I think it might have the same employer, but it doesn't really change the fact that the lawyers who gave the advice and what was the central concern of Kiobel are in the U.K. That's where the primary custodians were, and that's what the issue in Minoka was. It involved various Elliott entities, some of which had access to documents overseas, even though Elliott headquarters was in New York. So I think Minoka is actually very instructive on that. I just want to make three quick points because I know we don't have much time. I think the first point is just on the scope of the subpoenas because I think there was some discussion about how narrow they were. I think the fact that my friend on the other side suggested or agreed that there's going to be a 9,000-page privilege log should— I think that was me that suggested it. Okay, fine. But the fact that that seems to be consensus, and I don't think we dispute that either, should, I think, raise alarm bells, particularly when all that privilege is going to have to be under various other countries' laws. I think, unlike— I'm not sure it's appropriate to place any weight at all on the 9,000 states. We have no idea. It may be two lines for all we know. Well, I can tell you confidently it's not going to be two lines based on the General Counsel's declaration at 1508 and thereabouts. It's going to be longer than that. And I think it goes—  It goes to the point that this is a law firm. It's unusual that they're seeking documents from a law firm. They're saying it's lobbying so we should just be able to look at all of your documents and we get to fight and the courts have to make a decision about what's privileged and what's not. If that is the case, it's not just lobbying either. Any company could come in and say they provided business advice. They provided financial advice. They provided other kinds of advice that are not— We don't do that. We do that all the time at Discovery. But Kiobel says when you have a law firm that represents a foreign client and the documents are not discoverable from that client, this is not the appropriate procedure to do so. Can I go back just to, again, I'm looking at the proposed subpoena that came out after the order. Yes. I was just going to go there next. So putting aside number 1 and 2, paragraphs 3 through 14 are all communications between Aiken and third parties. Is that right? Yes. That's the way I read it. So why under Ratliff aren't those fair game or your view would be that Kiobel sort of— because I don't think Kiobel purported to sort of extend that principle to the Ratliff scenario, specifically distinguished and said this isn't a case where things have been disclosed to third parties. Agreed. If they're disclosed to third parties as in the Ratliff situation where the documents were turned over to the SEC and therefore made public in Ratliff's view, I think that's a different situation than what we have here. Let's look kind of through what these categories are of communications. Let's start with number 3. Communications between you and Houthoff Cooperatief, that is a Dutch law firm. That is a Dutch law firm that Aiken Gump worked with in representing Fort Nova. Okay, so some of these are third parties. I mean, there's third parties and there's third parties. All of these, yeah, all of these, I think, until you get down to maybe 14, which talks about true third parties, all of these are vendors, custodians, I mean, vendors, co-counsel. People who are under the umbrella. Investment banks that worked with in the restructuring.  These are not classic communications like, well, you published this in the New York Times. These are communications like, you know, you consulted with a Dutch law firm in providing counsel to Fort Nova regarding these transactions, turn over those documents to. So it's a quite, it's quite broad. And, in fact, I think the magistrate judge herself even said that the question of whether communications with law firms or with vendors that Aiken Gump might have retained under foreign privilege law, this is at SPA 45, says, is a decision for another day whether those should be turned over or not. Respectfully, Your Honor, I think that decision should be made today. Rather than having a 9,000-page privilege log, I think the decision should be under Kiobel, they needed to make a showing that the documents were discoverable abroad. And if, you know, from the client itself. Otherwise, this is pure circumvention of the Fisher rule, which says essentially if you can't get documents from the client, you shouldn't be able to go after the lawyers.  But, I mean, I think one of the things that I, and I get your argument on Kiobel. This is, there's a robust reading of Kiobel, and I think that's the reading you're embracing. And then there's a sort of ways to note around the edges. And so, one question I guess I have is, the court seemed dissatisfied with the level of generality of the representations that your side made to persuade the court that this was thousands of hours of time and money to generate a handful of actually disclosable documents, and therefore an undue burden. And I think the court responded to that by saying, if that proves to be true, come, you know, do your meet and confer, and then you can come back. And I'm wondering whether once you get to a place where you aren't speculating about the size of the privilege log, but you have a more, and I know you're not speculating, but when you have a more clear picture, whether that's the time to have that conversation, given the sort of, at least the magistrate judge and the district court's dissatisfaction with the level of granularity that they had to work with then. I take the point, Your Honor, that, you know, I read it a similar way. I think it was a bit of a chicken or the egg problem. They didn't want to do the whole review in order to tell the court that they shouldn't have to do the whole review because I think even doing that review is starting to jeopardize the attorney-client communications. But I will point you to JA 1508 through 1513, which is the third declaration of our general counsel, which I think does make pretty clear that most of these communications are likely to be protected from disclosure under the attorney-client privilege, that no, no lobbying work was done in Europe whatsoever. The small amount of lobbying work done in the U.S. did not relate to any of the issues in the subpoena and various other representations to that effect. So I do think we built a record. Again, I agree with you that they didn't think maybe it was sufficient. But at the end of the day, I think that's what Kiobel is really about. It's worried about what's going to happen to attorney-client privileges, what's going to happen to communications, what's going to happen to U.S. law firm practices, what's going to happen to hiring decisions. And I can just tell you from my client's perspective, they never thought in a million years that this European-focused matter would turn into a discovery dispute here. So... Do you think the question of whether... And I'm sorry I interrupted you. No, no, not at all. Do you think the question of whether the opinion letter that they generated, whether that's lobbying and therefore outside, so not in the attorney-client category, is that a question for now or is that in the box of a question for the next fight? We thought it was a question for now because it's on its face as a legal opinion. It analyzes these questions based on know-your-customer laws, European sanctions laws, Dutch law, and provides what is an opinion. Now, the question of whether it was used in some sort of lobbying capacity, it was passed along or something, that's a separate question. No one alleges that Aiken actually was the one that passed it along. But given that the notion of lobbying was never embedded in the sort of final description that the court gave, there's a lot of discussion about it. Is it possible... Let's assume for a minute that we... I know you're swinging for the fences, right? You want an order that says, Sario, Fisher, Keeble, this is not a proper subpoena. You're done. If we reject that, can we do so without engaging with the lobbying conversation and leaving that for the next fight? Well, Your Honor, I'm not sure I understand what you're getting at. I mean, I think you could say, you could make clear that there's no freestanding lobbying exception and that just merely reciting the words lobbying doesn't get you to allow you to go through a law firm's documents in a situation like this, which runs afoul of what Keeble recognized. So I think if that's what you're asking, I think that could happen if I'm missing the question. I don't even know what I'm asking. Yeah. Thank you. That's a fair enough answer. I appreciate it. The final point, Your Honor, is just that this Court's Binocco decision came out in August. The district court didn't have the benefit of that decision when it rendered its decision in May, and neither did the magistrate judge. But Binocco specifically says, it seems to me, that there's discretion in the district court here. In fact, I think it says, the court may and should focus on the location of the documents. But that's within the discretion of the district court. Is it not? It's absolutely the discretion of the case, Your Honor. But I do think the should consider is meaningful here, just like the should not exercise the discretion in the Keeble rule. I think both of those are pretty strong indications that this Court expects district courts to consider it, even if maybe in certain circumstances it's not relevant. Thank you very much for your time. Thank you. Thank you all. We'll take it under advisement.